United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         NORTHERN DISTRICT OF CALIFORNIA

10

11    SUSAN M. LEAMAN,                          No. C-12-05853 DMR

12              Plaintiff(s),              **ORDER GRANTING DEFENDANT'S
                                           MOTION FOR SUMMARY JUDGMENT**
13        v.                               **AND DENYING PLAINTIFF'S MOTION
                                           FOR SUMMARY JUDGMENT**
14    CAROLYN W. COLVIN,

15              Defendant(s).
      _____/
16

17         Pursuant to 42 U.S.C. § 405(g), Plaintiff Susan Mary Leaman ("Plaintiff") seeks judicial

18   review of her application for disabled widow's insurance benefits and supplemental security income

19   ("SSI") benefits.  Defendant Social Security Commissioner ("Defendant" or "Commissioner")

20   denied her application after determining that Plaintiff was not disabled under Titles II and XVI of

21   the Social Security Act ("Act"), 42 U.S.C. §§ 402(e), 423(d), and 1382c(a)(3)(A).  Both parties filed

22   motions for summary judgment.  For the reasons stated below, the court grants Defendant's motion

23   and denies Plaintiff's motion.

24                              **I.  Procedural History**

25         On July 17, 2009, Plaintiff filed an application for SSI benefits under Title XVI of the Act,

26   and an application for disabled widow's insurance benefits under Title II of the Act, alleging

27   disability beginning September 30, 2008.  Administrative Record ("A.R.") 252-266.  The agency

28   denied Plaintiff's claim, and subsequently denied it again upon reconsideration on February 18,

2010.  A.R. 174-177, 178-183, 187-192.  On August 23, 2010, Administrative Law Judge (ALJ) Judson Scott held a hearing at which Plaintiff was represented by counsel.  A.R. 54-123.  Plaintiff testified, as did Steven Gerber, M.D., a medical expert, and Robert Raschke, a vocational expert.  A.R. 20.  A supplemental hearing was held on January 18, 2011.  A.R. 124-167.  At the supplemental hearing, Plaintiff was again represented by counsel.  She testified, as did Herbert M. Tanenhaus, M.D., a medical expert, and Jeff Beeman, a vocational expert.  A.R. 20.

On March 7, 2011, the ALJ issued a written decision denying Plaintiff's claim and holding that Plaintiff was not disabled.  A.R. 22-28.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the Commissioner's final decision.  A.R. 1-2.  Plaintiff then filed this action.

## II.  Factual Background

### A.  Background

The record contains the following information.  Plaintiff was 49 years old as of the alleged onset of her disability on September 30, 2008.  A.R. 252.  As of March 31, 2010, Plaintiff was 51 years old. A.R. 21.  Her last marriage ended with the death of her husband on March 8, 2003.  A.R. 253.  Plaintiff has never worked full-time, but has held several part-time jobs, including teacher's aide in an after school program, administrative assistant, and hostess and cashier at a restaurant.  A.R. 133.  Plaintiff worked as an Avon salesperson from 1984 until June 2010, when her physical impairments "made it impossible to do" the work and she was deactivated by the company.  A.R. 66-69, 133.

Plaintiff testified that suffered from right foot pain secondary to gout, and pain in her neck and low back and fatigue secondary to fibromyalgia.  A.R. 69-70, 80-81, 152.  She felt "significantly impacted" by her fibromyalgia symptoms 75 to 80 percent of the time.  A.R. 152.  Plaintiff reported that the pain in her neck, back, and hips required her to alternate sitting with periods of walking around, but she could not cycle between those activities for more than a half an hour before having to lie down for 20 to 30 minutes, and at maximum could cycle between lying down and 30 minutes of activity about four times a day.  A.R. 70-72.  Plaintiff testified that she has Alport's syndrome, a kidney disease, which runs in her family, and diabetes, which is stable because she is under

**United States District Court**

For the Northern District of California

medication.  A.R. 73, 77.  Plaintiff also asserted other physical problems, including thyroid issues controlled by medication; heart disease; gastroesophageal reflux disease controlled by medication; an abdominal hernia; degenerative disc disease; obesity; and pain in her left arm, which has been restored to normal functioning through physical therapy.  A.R. 76, 86, 148-151.

At the initial hearing, Plaintiff testified that she suffered from depression, for which she took Wellbutrin, which did not help very much and caused her difficulties with concentrating and retaining information.  A.R. 76, 92.  Plaintiff clarified that her depression did not keep her from working because her medication made her able to function.  A.R. 139.  Plaintiff had not received or sought mental health treatment.  A.R. 77.  However, she also confirmed that she was claiming disability only on the basis of her physical condition and not any mental disability.  A.R. 65.  At the supplemental hearing, Plaintiff's counsel repeated that Plaintiff did not claim disability on the basis of her mental condition.  A.R. 129 ("There may be some psychiatric issues that contribute . . . [but] primarily . . . we believe she's disabled because of physical issues.").  Nonetheless, the ALJ noted that "Ms. Leaman agreed at the [first] hearing that there were no psychiatric or emotional claims either.  But as later testimony developed regarding depression and the fact that she was taking Wellbutrin, then . . . I became persuaded that there may be psychiatric issues, and so I wanted to make sure we have everything properly developed and before the court for a decision."  A.R. 131.  Subsequent to the first hearing, the ALJ referred Plaintiff to a consultative examiner, Salma Khan, M.D., a psychiatrist.  A.R. 506.

With regard to her activities of daily living, Plaintiff woke around 10:30 a.m. because she had difficulty sleeping at night.  A.R. 142.  Plaintiff was able to prepare food, get cleaned up and get dressed without help.  A.R. 142.  Plaintiff reported no problems with personal care, except that she was slower at those activities than she had previously been.  A.R. 341.  Plaintiff was able to drive, feed her cats, correspond via phone and computer, work on her Avon website, watch television and work on her hobbies.  A.R. 146, 340.  She lived with her boyfriend, who did most of the cleaning, caring for their cats, and vacuuming, because she would feel fatigued or weak in her knees and legs if she did any lifting or vacuuming.  A.R. 142-143.  She sometimes accompanied her boyfriend to go grocery shopping.  A.R. 146-147.  She shopped in stores and by mail and computer for groceries,

clothing, personal needs, books, and hobbies.  A.R. 343.  She was able to pay bills, handle a saving

account, count change, and use a checkbook.  A.R. 343.  She engaged in social activities every day,

including talking on the phone, using email and Facebook, going to church, Bible study and prayer

group, visiting with friends and family, and personally delivering Avon products, also she reported

not being able to participate in social activities like she used to because she was in pain and tired

easily.  AR. 345.  She stated that she got along well with authority figures, had always left her jobs

on good terms, handled stress "reasonably well," and handled changes in routine "reasonably well,

but changes stress[ed] [her] out."  A.R. 346.

**B. Plaintiff's Relevant Medical History**

      **1. Dr. Ilyas Iliya - Treating Physician**

Plaintiff was treated by Dr. Ilyas Iliya, a specialist in nephrology and internal medicine,

several times between November 6, 2007 and December 4, 2009.

On November 6, 2007, Dr. Iliya noted that he had first met Plaintiff many years ago but had

not seen her in over five years.  A.R. 397.  Plaintiff presented to Dr. Iliya for evaluation and

monitoring of her kidney disease secondary to Alport's syndrome, with which she had been

diagnosed about 20 years earlier on the basis of family history, genetic testing, and other laboratory

tests.  A.R. 397.  She also reported her history of gestational diabetes in 1983, hyperlipidemia,

hypothyroidism, fibromyalgia, and GERD.  A.R. 397.  Dr. Iliya noted that Plaintiff had high blood

pressure and that laboratory tests suggested that her kidney disease was either at stage II or III. A.R.

398.  On June 5, 2008, Dr. Iliya noted that Plaintiff had recurrent pain in her neck and back and high

blood pressure, but that her kidney disease had improved since 2006.  A.R. 395.  On February 19,

2009, Plaintiff reported "feeling about the same" overall but had also had an attack of gout, which

responded to medication.  A.R. 393.  Dr. Iliya diagnosed her with high blood pressure and stage III

chronic kidney disease and adjusted her renal medications and stated that he would adjust her

antihypertensive medication if it had not improved by Plaintiff's next visit.  A.R. 393.  On June 3,

2009, Dr. Iliya found that Plaintiff had "stable renal insufficiency, secondary to Alport's syndrome"

and "blood pressure suboptimally controlled," and that she reported ongoing leg pain and difficulty

sitting for prolonged periods.  A.R. 392.

In a letter addressed to Plaintiff's new primary care physician dated June 24, 2009, Dr. Iliya noted her history of Alport's syndrome, diabetes mellitus since 1990, fatigue, intermittent foot swelling, and difficulty concentrating and retaining information.  A.R. 401.  He reported that Plaintiff had "stable stage III chronic kidney disease, secondary to Alport's syndrome," that Plaintiff's blood pressure was "much better controlled at this point," that Plaintiff would return to see him in a few months and that "hopefully her renal function will continue to remain stable during the interim."  A.R. 401.  He also stated that "[b]ecause of the above symptoms and also difficulty in the patient sitting for prolonged periods," he would "initiate disability insurance benefit."  A.R. 401.  In a August 26, 2009 follow up visit, Dr. Iliya noted that Plaintiff's creatinine level had increased but he was not yet certain of its clinical significance, and her blood pressure was "excellent."  A.R. 444.  During another follow up visit on December 4, 2009, Plaintiff stated that she felt depressed and Dr. Iliya noted that her depression was "inadequately controlled."  A.R. 443.

On April 7, 2010, Dr. Iliya completed a Multiple Impairment Questionnaire on the basis of his treatment of Plaintiff since November of 2007 for what he diagnosed as stage III kidney disease, severe depression, and degenerative disc disease in the neck.  A.R. 458.  He stated that Plaintiff's primary symptoms consisted of chronic pain and fatigue, bilateral foot swelling, gout in her ankles, weakness, chronic neck pain, and symptoms stemming from fibromyalgia.  A.R. 459.  He estimated that, in an eight-hour workday, Plaintiff could sit or stand/walk for no more than two hours each; that she would need to get up and move around for ten minutes at 30-minute intervals; that she could occasionally lift or carry no more than five pounds; and that she would have moderate limitations in her ability to reach.  A.R. 460-462.  Dr. Iliya added that her pain and fatigue are "frequently" severe enough to interfere with her attention and concentration; that she could tolerate no more than a "low stress" work environment; that she would likely miss more than three workdays a month due to her impairments; and that the limitations that would affect Plaintiff's ability to work at a regular job on a sustained basis included that Plaintiff needed to avoid noise, fumes, temperature extremes, dust, heights, pushing, pulling, kneeling, bending, and stooping  A.R. 463-464.  Dr. Iliya noted that Plaintiff's prognosis was "fair," but that the limitations and symptoms he described in the questionnaire would continue for "many years."  A.R. 458, 464.

United States District Court
For the Northern District of California

In a letter dated July 14, 2011, submitted to the Appeals Council after the ALJ had already rendered his decision, Dr. Iliya affirmed the persistence of the symptoms acknowledged in his Questionnaire responses, affirmed the functional limitations that stem from those symptoms and conditions, and concluded that Plaintiff is "totally physically impaired." A.R. 522.

**ii. Dr. Arretz – Treating Physician**

Desiree Arretz, M.D., an internist, began treating Plaintiff as her primary care physician in July of 2009.   Plaintiff reported feeling weak and with pressure in her chest for the preceding three weeks. A.R. 501.  She was sent for an echocardiogram and stress test, which revealed no evidence of ischemia. A.R. 499-500.  Her fibromyalgia and kidney disease were considered "stable." A.R. 501.  She presented with mild soft tissue swelling in the right foot in September of 2009, but fracture and dislocation were ruled out by x-ray. A.R. 495.  On September 15, 2009, Plaintiff reported that her right ankle and foot pain persisted, and Dr. Arretz opined that the pain and edema were due to gout or a sprain. A.R. 493.  In November of 2009, her medications for fibromyalgia were continued. A.R. 492.  On February 10, 2010, Plaintiff presented with fatigue, in addition to other symptoms, that were attributed to a virus. A.R. 491.  On June 10, 2010, she reported being "in constant pain" due to her fibromyalgia flaring up as well as "gouty attacks," neck pain, shoulder pain, and low back pain. A.R. 488.  Examination showed 12 of 18 tender points consistent with fibromyalgia, for which Plaintiff's medication was continued.  A.R. 488.

In a Multiple Impairment Questionnaire dated June 18, 2010, Dr. Arretz diagnosed Plaintiff as having fibromyalgia, kidney disease, hypertension, diabetes mellitus, hypothyroidism, and depression. A.R. 480-486.  Dr. Arretz noted that Plaintiff's prognosis was poor to fair.  A.R. 480.  Clinical findings in support of the diagnoses included 12 of 18 tender points consistent with fibromyalgia. A.R. 480-481.  Her primary symptoms were said to consist of generalized pain and pain in the neck, shoulder, and back, all of which were exacerbated by stress and fatigue.  A.R. 481.  Dr. Arretz estimated that, in an eight-hour workday, Plaintiff could sit or stand/walk no more than one hour each; that she would have to alternate between sitting and standing every half hour; and that she would have moderate limitations in her ability to perform fine and gross manipulations and reach A.R. 481-483.  Dr. Arretz reported that Plaintiff's baseline pain was moderate and that her

**United States District Court**
For the Northern District of California

baseline fatigue was moderately severe.  A.R. 482.  Dr. Arretz added that Plaintiff's symptoms would frequently interfere with her attention and concentration; that she could tolerate no more than a "low stress" work environment; and that she would likely miss more than three workdays a month due to her symptoms.  A.R. 484-485.

On September 7, 2010, Dr. Arretz wrote a summary report regarding Plaintiff's impairments and the functional limitations they imposed.  A.R. 504.  She noted that Plaintiff had sought treatment for fibromyalgia, diabetes, hypertension, and chronic kidney disease, and that the fibromyalgia was diagnosed "by an outside physician prior to starting with [Dr. Arretz'] practice."  A.R. 504.  Dr. Arretz stated that Plaintiff reported her symptoms began in approximately 2005 but had worsened since 2008 until she had "total body pain" that was exacerbated by stress and physical activity, and difficulty walking.  A.R. 504.  Dr. Arretz reported the presence of 12 of the 18 tender points characteristic of fibromyalgia, and stated that the condition is "chronic and prone to frequent exacerbations," such that she "do[es] not expect Plaintiff to recover sufficiently to be able to consistently maintain a steady job."  A.R. 504.

### iii. Dr. Seu – Examining Physician

On September 8, 2009, the state agency sent Plaintiff for a consultative examination by general surgeon Philip Seu.  A.R. 412-416.  Plaintiff reported her history of kidney disease and fibromyalgia, with no specific complications from her kidney disease but generalized muscle pain and chronic fatigue from her fibromyalgia.  A.R. 412.  Dr. Seu noted that she had been diagnosed with fibromyalgia by one physician.  A.R. 412.  Plaintiff reported that she was able to walk on a treadmill and do stretching exercises.  A.R. 413.  Dr. Seu found Plaintiff to appear physically comfortable, with no trouble walking, sitting, standing, using her hands, taking her shoes on and off, or getting on and off the exam table.  A.R. 413.  Dr. Seu also found obesity, at Plaintiff's height of 5'6" and weight of 230 pounds; an easily reducible incisional hernia in the abdomen; reduced right radial pulse; limited ranges of left shoulder motion; mild tenderness at the base of the neck, left shoulder region, and ankle regions bilaterally; no muscle spasms and no other joint effusions or abnormalities; no trigger points; and trace pretibial edema.  A.R. 413-415.  Dr. Seu diagnosed Alport's syndrome (but noted that "she has not had problems with renal failure" and "[b]y her report

**United States District Court**
For the Northern District of California

1    she has had no other complications of this diagnosis"), left shoulder strain, type II diabetes, and

2    hypertension.  Dr. Seu opined that, in an eight-hour workday, Plaintiff could stand, walk, sit and

3    perform postural activities "without limitations"; that she could lift and carry 50 pounds

4    occasionally and 25 pounds frequently; that she had no workplace environmental limitations; and

5    that her manipulative activities could be performed without limitations except she could only

6    occasionally reach overhead with her left arm due to tenderness and decreased range of motion.

7    A.R. 415-416.

8         **iv. Dr. Bilbrey – Examining Psychologist**

9         On September 26, 2009, psychologist Robert Bilbrey examined and evaluated Plaintiff.  A.R.

10   423-425.  Plaintiff had not seen a psychotherapist in six years, and had no history of inpatient

11   treatment.  A.R. 423.  Plaintiff reported she was able to perform most of her activities of daily living,

12   but she had difficulties with activities such as mopping floors or gardening.  A.R. 424.  A mental

13   status examination revealed no abnormalities.  A.R. 424.  Dr. Bilbrey diagnosed depression, not

14   otherwise specified, assessed her GAF at 85, and endorsed no mental function limitations.  A.R. 425.

15   He noted that she would be able to perform simple and complex tasks, that she could accept

16   instructions from supervisors and interact with coworkers and the public, that she would be able to

17   perform work activities on a consistent basis without additional or special instruction, that she would

18   be able to maintain regular attendance in the workplace and complete a normal workday and

19   workweek without interruptions from her psychiatric conditions, and that she would be able to deal

20   with the usual stressors encountered in the work environment.  A.R. 425.  Dr. Bilbrey stated that

21   Plaintiff's prognosis was good, and that if her symptoms of depression persist, "she should obtain

22   psychotherapy, as many people with depressive symptoms can be restored to normal functioning

23   with standard treatment."  A.R. 425.

24        **v. Dr. Khan – Examining Psychiatrist**

25        On October 6, 2010, Plaintiff was evaluated by psychiatrist Salma Khan at the behest of the

26   state agency.  A.R. 511-516.  Plaintiff told Dr. Khan that she had chronic depression, which became

27   disabling a year prior, and chronic pain from gout and fibromyalgia.  A.R. 511-512.  Dr. Khan's

28   mental status examination revealed that Plaintiff seemed overwhelmed by numerous life stressors;

**United States District Court**
For the Northern District of California

1  focused on her chronic physical pain and financial situation; endorsed depression-related symptoms

2  including anhedonia, sadness, and decreased motivation; and was overly expressive, somewhat

3  dramatic, and apparently anxious, but was otherwise within normal limits.  A.R. 514-515.  Dr. Khan

4  diagnosed Major Depression, recurrent, moderate; and an Adjustment Disorder with a depressed

5  mood, and assessed her GAF at 55 to 60.  A.R. 515.  Dr. Khan found that Plaintiff's lack of full-time

6  employment history made it "difficult to judge her normal functional capacity."  A.R. 516.  Dr.

7  Khan also stated that Dr. Khan did not "think she meets the threshold for disability due to a mental

8  disorder.  [Plaintiff] appears to have a long standing depression exacerbated by recent stressors."

9  A.R. 516.

10     In a formal assessment of Plaintiff's mental residual functional capacity, Dr. Khan found

11  Plaintiff moderately limited in her ability to interact appropriately with supervisors and co-workers.

12  A.R. 509.  Dr. Khan also found that Plaintiff has mild limitations in her ability to interact

13  appropriately with the public; respond to usual work situations and changes; make judgments as to

14  both simple and complex work decisions; and understand, remember, and carry out complex

15  instructions.  A.R. 508-509.

16     **vi.  Dr. Estrin - Non-examining Physician**

17     On September 17, 2009, Dr. H.M. Estrin, a non-examining review physician with the state

18  agency, assessed Plaintiff's residual physical function in light of his review of records then in the

19  case file.  A.R. 417-422.  Dr. Estrin opined that Plaintiff could occasionally lift and carry 20 pounds,

20  frequently lift and carry 10 pounds, stand and sit about six hours in an 8-hour workday, and perform

21  the exertional requirements of light work, save for a limited ability to push or pull with her left upper

22  extremity and no more than occasional postural activities.  A.R. 417-420.

23     **vii.  Testimony of Medical Experts**

24     At the first administrative hearing, the government called Dr. Steven Gerber, a specialist in

25  internal medicine, to testify as a medical expert.  A.R. 58-65, 78-88.  Dr. Gerber acknowledged that

26  the record reflected evidence of the following medically determinable physical impairments:

27  hypertension, mild bilateral renal insufficiency secondary to Alport syndrome, gout,

28

United States District Court

For the Northern District of California

gastroesophageal reflux disease, type II diabetes mellitus, fibromyalgia,[1] left shoulder strain, and obesity at a height of 5'6" and a weight of 230 pounds.  A.R. 79-81, 83.  Dr. Gerber opined that, in light of her physical impairments, Plaintiff could stand and/or walk two hours a day; sit for six hours a day; lift and carry ten pounds frequently and 20 pounds occasionally; occasionally perform postural activities; with no climbing of ladders, scaffolds, or ropes; and reach overhead only occasionally with her left arm as of September of 2009 (although the ALJ noted that Plaintiff had testified that her left arm had recovered since Dr. Gerber's review of her medical records).  A.R. 84-85.

The government called psychiatrist Herbert Tanenhaus to testify as psychiatric expert at the second administrative hearing.  A.R. 148-155.  He found that the record contains evidence that Plaintiff suffers from an affective disorder but that it does not meet or equal the criteria of a listing in 20 C.F.R., Pt. 404, Subpt. P, App. 1.  A.R. 148, 152.  He found her capable of performing complex work, opining that her Avon work was complex in nature.  A.R. 153-154.  He opined that her depression caused her mild impairment in her activities of daily living, mild impairment in her social functioning, and mild difficulties maintaining concentration or pace, and that he found no episodes of decompensation.  A.R. 153.  Dr. Tanenhaus noted that the unpredictability of the recurrence of Plaintiff's fibromyalgia or other conditions would be something that would interfere with her being hired or maintained at work.  A.R. 153.  He also found that Plaintiff's ability to deal with stress was moderately impaired, and that stress could cause an increase in Plaintiff's experience of fibromyalgia.  A.R. 154.

**viii. Testimony of Vocational Experts**

At the first administrative hearing, the government called Robert Raschke to testify as vocational expert ("VE Raschke").  A.R. 95-120.  VE Raschke characterized Plaintiff's past relevant work as administrative assistant, a skilled, sedentary job; hostess/cashier, a semi-skilled, light job;

---

[1] Dr. Gerber noted that Plaintiff's fibromyalgia was "inconsistently documented, but one doctor [Dr. Arretz, an internist] did make that diagnosis with trigger points" and that traditionally the diagnosis is made by a rheumatologist, not an internist.  A.R. 80.  Plaintiff testified that she had fibromyalgia diagnosed in 1989 by a rheumatologist, but the ALJ noted that she had not provided any medical records from that rheumatologist.  A.R. 80.

counter worker in fabric sales, a semi-skilled, light job; teacher's aide, a semi-skilled, medium job. A.R. 96-97.   Plaintiff's work as an Avon representative had not been at significant gainful employment levels. A.R. 98.  The ALJ presented two hypotheticals to VE Raschke.  With respect to the first, VE Raschke opined that someone capable of performing light work and occasional posturals but with no kneeling or crawling; who could not have concentrated exposure to temperature extremes or airborne irritants work or work at heights or with hazards or vibrations; in work that requires no more than simple tasks and is low-stress in nature, requiring few changes and decisions; with the need for a sit/stand option at will with the ability to "walk around if needed" and the need to be off-task for ten percent of the workday could not perform any of Plaintiff's past relevant work.  A.R. 98-100.  Plaintiff's past work as Avon representative required "lightweight office . . . [and] general filing kinds of skills" as well as "attention to detail" that would transfer to a job such as receptionist, which would entail taking messages and meeting and greeting at the semi-skilled level, but the receptionist job would be precluded by the limitation in the hypothetical to unskilled work.  A.R. 101-102.  Jobs that would accommodate the terms of the hypothetical—including the sit/stand option, which is not mentioned in the DOT but which VE Raschke had learned through his 40 years of experience with labor market surveys and work site analysis—include small products assembler, a light job (DOT No. 739.687-030); shade assembler, a sedentary job (DOT No. 739.684-094); and cleaner/polisher, a light job (DOT No. 709.687-010).  A.R. 27, 102-106.  The numbers of all of those jobs would be eroded by 40 percent to accommodate the sit/stand option and the need for a low stress work environment.  A.R. 104-105, 106.  The need to walk around briefly would be permitted if the worker needed to "step back" from the workstation but not necessarily leave it.  A.R. 107.  Needing to lie down every hour for 30 minutes each time would preclude all work.  A.R. 108-109.

VE Raschke found that a second hypothetical person, with the same limitations as the first but with the ability to stand and/or walk no more than two hours a day, would be limited to sedentary jobs or light jobs that could be performed with Plaintiff's sedentary postural requirements, which would reduce the numbers of all the above-cited available jobs by 90 percent.  A.R. 109-110. Being off-task for 10 percent of a workday in one of these entry-level production jobs would be

"acceptable in most of these jobs," as long as "other factors" do not make the person "a visible employee." A.R. 111.  Being off-task 15 percent of a workday would preclude those jobs.  A.R. 112.

Jeff Beeman ("VE Beeman") testified as vocational expert at the second administrative hearing. A.R. 157-162.  The ALJ asked VE Beeman to assume a hypothetical individual capable of standing and/or walking for two hours a day and sitting for six hours a day, and with the need to alternate sitting and standing at will with the ability to briefly walk around as needed as part of the postural change; occasional postural activities except no kneeling or crawling; no exposure to temperature extremes or airborne irritants; no climbing of ropes, scaffolds, or ladders; no heights, hazards, or vibrations; no more than simple repetitive tasks up to four-step tasks, including semi-skilled tasks; no more than a "low stress" occupation in that it would entail few changes in the work setting; and having the need to be "off task" for up to ten percent of the workday.  VE Beeman stated that this hypothetical individual would not be able to perform any of Plaintiff's past relevant work. A.R. 159-160.  However, VE Beeman found that that individual could perform other occupations including the sedentary, unskilled jobs of clerk (DOT # 249.587-014); food service industry order clerk (DOT # 209.567-014); and assembler (DOT # 734.687-018).  A.R. 162-163. The numbers of each of those jobs would not be eroded due to any of the hypothetical factors.  A.R. 162-165.

### III. Evaluation of Claims for Benefits

**A. Evaluating Disabled Widow's Benefits**

When a person receiving Social Security disability benefits dies, the surviving spouse might qualify for benefits as a survivor. 20 C.F.R. § 404.335.  In this case, given Plaintiff's age and circumstances at the time of her husband's death in 2003, she qualifies for widow's benefits if she can prove the following: she is the widow of a deceased worker who previously qualified for Social Security Benefits, she attained the age of 50, she has not re-married, and she has a disability that began before the end of the statutorily prescribed period. 20 C.F.R. § 404.335(c)(ii). The prescribed period ends the month prior to the month in which the claimant attains age 60, or, if earlier, either 7 years after the worker's death, or 7 years after the widow was last entitled to survivor's benefits, whichever is later. 20 C.F.R. § 404.335(c)(1).

1    Plaintiff's prescribed period began on March 8, 2003, the date Plaintiff's ex-husband died.

2    A.R. 21.  The prescribed period ended on March 31, 2010.  A.R. 21.  Therefore, Plaintiff must

3    establish that her disability began on or before March 31, 2010 to be entitled to disabled widow's

4    benefits.  A.R. 21.

5    **B.  The Five-Step Sequential Evaluation Process For Evaluating Disability**

6    In order for the ALJ to find that Plaintiff is disabled, a claimant must demonstrate a

7    medically determinable physical or mental impairment that prevents her from engaging in

8    substantial gainful activity[2] and that is expected to result in death or to last for a continuous period

9    of at least twelve months.  *Reddick v. Chater,* 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. §

10   423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she

11   previously performed and incapable of performing any other substantial gainful employment that

12   exists in the national economy.  *Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42

13   U.S.C. § 423(d)(2)(A)).

14   To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R.

15   §§ 404.1520, 416.920. The steps are as follows:

16   1.   At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing

17        substantial gainful activity, the ALJ will find that the claimant is not disabled.

18   2.   At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If

19        the claimant does not have a severe medically determinable physical or mental impairment that

20        meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that

21        is severe and meets the duration requirement, the ALJ will find that the claimant is not

22        disabled

23   3.   At the third step, the ALJ also considers the medical severity of the claimant's impairment(s).

24        If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt.

25

26   _____

27        [2] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

28

**United States District Court**
For the Northern District of California

404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.   At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.   At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett,* 180 F.3d at 1098-99.

### IV.  The March 7, 2011 Decision By the ALJ

In the March 7, 2011 decision, the ALJ first found that Plaintiff was the unmarried widow of a deceased insured worker and has attained the age of 50, and thus met the non-disability requirements for disabled widow's benefits.

The ALJ then applied the five-step sequential evaluation to determine whether Plaintiff was disabled. A.R. 20-28. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 30, 2008. A.R. 23. At Step Two, the ALJ found that Plaintiff had the following severe impairments: affective disorder, diabetes mellitus type 2, obesity, chronic neck and low back pain, and fatigue. A.R. 23.

At Step Three, the ALJ found that Plaintiff's impairment did not meet or equal a presumptively disabling impairment in the Listings. A.R. 26. The ALJ found that Plaintiff retained the capacity to perform the requirements of exertionally light work, reduced by the need to alternate sitting and standing at will with the ability to walk around briefly; no kneeling or crawling; occasional other postural activities; no exposure to temperature extremes, airborne irritants, hazards, or heights; and no climbing of ladders, ropes, or scaffolds; in a job that requires no more than one- to two-step tasks; in a "low stress" environment, which requires few changes or decisions; and the ability to be "off-task" for up to ten percent of the workday. A.R. 24-25. In so finding, the ALJ found Plaintiff's

subjective complaints not credible, noting that her physical therapy was successful and highlighting the benign findings of the consultative internist.  A.R. 25.  The ALJ granted only "partial" or no weight to the opinions of treating physicians Iliya and Arretz, finding them too restrictive and inconsistent with their treatment notes.  A.R. 26.  He granted "great weight" to the opinion of medical advisor Tanenhaus and "moderate weight" to that of medical advisor Gerber.  A.R. 26.

At Step Four, the ALJ found that Plaintiff was "unable to perform any past relevant work." A.R. 26.  At Step Five, the ALJ determined that Plaintiff was not disabled because there were a significant number of jobs in the national economy that Plaintiff could perform, considering her age, education, work experience, and RFC.  A.R. 27.

## V. Issues Presented

Plaintiff contends that the ALJ erred at Steps Two, Three, and Four of the sequential evaluation process.  Specifically, the court will consider the following issues:

1.  Whether the ALJ erred in not listing Plaintiff's fibromyalgia as a severe impairment;

2.  Whether the ALJ erred in rejecting the opinions of Plaintiff's treating physicians;

3.  Whether the ALJ erred in evaluating Plaintiff's mental RFC;

4.  Whether the ALJ erred in rejecting Plaintiff's subjective testimony about her symptoms.

## VI.  Standard of Review

The ALJ's underlying determination "will be disturbed only if it is not supported by substantial evidence or it is based on legal error." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (internal quotation marks omitted).  "Substantial evidence" is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is "more than a mere scintilla" but less than a preponderance. *Id.*  If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  The ALJ is responsible for determining credibility and resolving conflicts in medical testimony, resolving ambiguities, and drawing inferences logically flowing from the evidence.  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984); *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.1982); *Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393,

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   1394-95 (9th Cir. 1984). "Finally, the court will not reverse an ALJ's decision for harmless error,

2   which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate

3   nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations

4   and internal quotation marks omitted); *Ludwig v. Astrue*, 681 F.3d 1047, 1054 (9th Cir. 2012)

5   ("Reversal on account of error is not automatic, but requires a determination of prejudice.").

## VII. Discussion

### A. Fibromyalgia Not Listed As Severe Impairment

8         Plaintiff argues that the ALJ erred at Step Two of the five-step sequential evaluation by not

9   listing fibromyalgia as a severe impairment.

10        Step Two of the sequential evaluation serves to eliminate groundless claims of disability

11  from claimants who have no impairments or combination of impairments that sufficiently limit their

12  functionality. *See Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) ("the step-two inquiry is a

13  de minimis screening device to dispose of groundless claims"). When an ALJ finds that a claimant

14  does not have any severe impairment, the ALJ will find that claimant not disabled at Step Two. *See*

15  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If a claimant has a severe impairment, then the

16  ALJ proceeds to the later steps of the sequential evaluation process. *See id.*

17        Here, the ALJ noted that Dr. Gerber had testified that Plaintiff had "fibromyalgia

18  (inconsistently diagnosed)," but did not find her fibromyalgia to be a severe impairment.  A.R. 23.

19  However, the ALJ did find that some of Plaintiff's other conditions constituted severe impairments,

20  and thus found that Plaintiff had prevailed at Step Two.  A.R. 23.  Because she had some severe

21  impairments, the ALJ was then required to move to the next step in the sequential evaluation and

22  consider the functional effect of all her impairments, severe and non-severe.  *See* SSR 96-8p ("[i]n

23  assessing [residual functional capacity], the adjudicator must consider limitations and restrictions

24  imposed by all of an individual's impairments, even those that are not 'severe'").  The ALJ did so:

25  he noted that Plaintiff had been "inconsistently diagnosed" with fibromyalgia and that Plaintiff's

26  treatment records describe her fibromyalgia as "stable"; he relied on the testimony of Dr. Gerber,

27  who considered Plaintiff's fibromyalgia and related symptoms when assessing her functional ability;

28  and his determination of Plaintiff's impairments and RFC included Plaintiff's fatigue, pain, and

United States District Court

For the Northern District of California

1  difficulty walking, the symptoms of Plaintiff's fibromyalgia.  A.R. 23-26.  Plaintiff does not point to

2  any significant limitations on Plaintiff's basic work abilities caused by her fibromyalgia beyond

3  those already found by the ALJ in his RFC determination.  The ALJ's RFC finding would not

4  change whether or not he found Plaintiff's fibromyalgia to be "severe" at Step Two, and thus the

5  court declines to find prejudicial error.

6  **B.  Evaluation of the Medical Evidence**

7        Plaintiff contends that the ALJ erred by giving only "partial weight" to the opinions of Drs.

8  Iliya and Arretz, who were Plaintiff's treating physicians.

9        When reviewing an ALJ's medical opinion determinations, courts distinguish between three

10  types of physicians: those who treat the claimant ("treating physicians"); and two categories of

11  "nontreating physicians," those who examine but do not treat the claimant ("examining physicians")

12  and those who neither examine nor treat the claimant ("nonexamining physicians").  *See Lester*, 81

13  F.3d at 830.  A treating physician's opinion is entitled to more weight than an examining physician's

14  opinion, and an examining physician's opinion is entitled to more weight than a nonexamining

15  physician's opinion.  *Id.*

16        The ALJ is entitled to resolve conflicts in the medical evidence.  *Sprague v. Bowen,* 812 F.2d

17  1226, 1230 (9th Cir. 1987).  However, to reject the opinion of an uncontradicted treating or

18  examining physician, an ALJ must provide "clear and convincing reasons."  *Lester*, 81 F.3d at 830;

19  *see also* § 416.927(d)(2); SSR 96-2p, 1996 WL 374186.  If another doctor contradicts a treating or

20  examining physician, the ALJ must provide "specific and legitimate reasons" supported by

21  substantial evidence to discount the treating or examining physician's opinion.  *Lester*, 81 F.3d at

22  830-31.  The ALJ meets this burden "by setting out a detailed and thorough summary of the facts

23  and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Reddick*,

24  157 F.3d at 725.  A nonexamining physician's opinion alone cannot constitute substantial evidence

25  to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4

26  (9th Cir. 1990), though it may be persuasive when supported by other factors.  *See Tonapetyan*, 242

27  F.3d at 1149; *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion

28  given contradictory laboratory test results, reports from examining physicians, and testimony from

United States District Court

For the Northern District of California

1    claimant).  An opinion more consistent with the record as a whole generally carries more

2    persuasiveness.  *See* §416.927(d)(4).

3         The ALJ gave specific  and legitimate reasons for giving "partial weight" to the opinions of

4    Drs. Iliya and Arretz.  The ALJ noted that "their assessment of claimant's physical limitations is too

5    restrictive and inconsistent with the claimant's own treatment notes, where her fibromyalgia is

6    described as stable [cite] and physical therapy described as successful."  A.R. 26.  Generally, Dr.

7    Iliya's treatment notes from November 6, 2007 and December 4, 2009 show that Plaintiff's kidney

8    condition was stable and her high blood pressure was improving.  Plaintiff had reported neck, back,

9    and leg pain to Dr. Iliya during her treatment, but the treatment notes do not indicate the severity of

10   Plaintiff's pain nor any functional limitations caused by that pain other than Plaintiff's difficulty

11   sitting for prolonged periods.  A.R. 401.  Dr. Iliya completed the Multiple Impairment Questionnaire

12   five months after the last time he treated Plaintiff, and his assessment of her pain, fatigue, and

13   physical impairments in that questionnaire painted a far more serious picture of Plaintiff's physical

14   health than his treatment notes had.  Similarly, Dr. Arretz's treatment notes from July 2009 until

15   June 2010 indicate that Plaintiff's fibromyalgia was stable at the start of the treatment period and

16   that Dr. Arretz had even suggested that Plaintiff increase her exercise in November 2009, although

17   by June 2010 Plaintiff reported being in "constant pain" due to her fibromyalgia and gout.  A.R. 488,

18   492, 501.  The questionnaire and summary report that Dr. Arretz filled out after Plaintiff's treatment

19   describe severe impairments (e.g., Plaintiff's inability to sit or stand/walk no more than one hour

20   each per day, A.R. 482) not reflected in these limited treatment notes.

21        Furthermore, the record as a whole is consistent with the ALJ's determination of Plaintiff's

22   RFC.  The ALJ noted that Dr. Seu, who had examined Plaintiff in September 2009 and performed

23   objective testing, had stated that Plaintiff "had no trouble walking, standing sitting, taking her shoes

24   on and off, or getting on and off the examination table."  A.R. 25, 413.  The opinion of Dr. Gerber,

25   the medical expert at the first hearing, is also generally consistent with the ALJ's RFC findings.

26   *Compare* A.R. 24-25 *with* 83-34.

27        Because substantial evidence in the record supports the ALJ's RFC finding, the ALJ did not

28   err by giving only "partial weight" to the opinions of Drs. Iliya and Arretz.

**C. Mental RFC Limitations**

Plaintiff contends that the ALJ erred because the hypothetical questions he asked of the vocational experts did not capture the mental RFC limitations endorsed by Dr. Khan.

Plaintiff's mental condition was described by examining physicians Dr. Bilbrey and Dr. Khan, and nonexamining medical expert Dr. Tanenhaus. Dr. Bilbrey endorsed *no* mental function limitations. A.R. 425. The ALJ noted that Dr. Bilbrey had found that Plaintiff "could accept instructions from supervisors and interact with coworkers and the public." A.R. 24. Dr. Khan also found that Plaintiff could work, but found Plaintiff's mental functioning to be slightly more limited: she found Plaintiff moderately limited in her ability to interact appropriately with supervisors and co-workers, and mildly limited in her ability to interact appropriately with the public; respond to usual work situations and changes; make judgments as to both simple and complex work decisions; and understand, remember, and carry out complex instructions. A.R. 508-09. Dr. Tanenhaus testified that Plaintiff's depression would result in mild limitations in Plaintiff's activities of daily living, social functioning, and concentration, persistence and pace. The ALJ gave Dr. Tanenhaus's testimony great weight, noting that it was consistent with the opinions of Drs. Bilbrey and Khan, and found that Plaintiff's mental impairments caused limitations at the same levels that Dr. Tanenhaus described. A.R. 24, 26, 153-54.

Plaintiff claims the ALJ improperly failed to consider Dr. Khan's findings that Plaintiff would be moderately limited in her ability to interact appropriately with supervisors and co-workers and mildly limited in her ability to interact appropriately with the public.

Where a record contains conflicting medical evidence, a reviewing court should defer to the ALJ's interpretation. *See Burch v. Barnhart*, 400 F.3d 676, 400 F.3d at 679 ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld") (citations omitted). Here, one consultative examiner's opinion contradicted the other's, and this court must defer to the ALJ's determination that Plaintiff only had mild restrictions in social functioning because it is supported by substantial evidence in the record, e.g. Dr. Bilbrey's report, Plaintiff's declaration that she engaged in social activities every day and that she got along well with

United States District Court

For the Northern District of California

1  authority figures (A.R. 345-46), her affirmation that she "related well" to people (A.R. 145), and her

2  continued work as a salesperson for nearly two years after the alleged onset date of her disability.

3  **D. Credibility of Plaintiff**

4         The ALJ found that Plaintiff's "medically determinable impairments could reasonably be

5  expected to cause the alleged symptoms; however, the claimant's . . . statements concerning the

6  intensity, persistence and limiting effects of these symptoms are not credible to the extent that they

7  are inconsistent with the above residual functional capacity assessment." A.R. 25.  Plaintiff argues

8  that the ALJ erred in discrediting her testimony.

9         An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional

10  impairment.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) (citing 42 U.S.C. § 423(d)(5) (A)).

11  Nevertheless, the ALJ's credibility determinations "must be supported by specific, cogent reasons."

12  *Reddick*, 157 F.3d at 722 (citation omitted).  If an ALJ discredits a claimant's subjective symptom

13  testimony, the ALJ must articulate specific reasons for doing so.  *Greger v. Barnhart*, 464 F.3d 968,

14  972 (9th Cir. 2006).  In evaluating a claimant's credibility, the ALJ cannot rely on general findings,

15  but "must specifically identify what testimony is credible and what evidence undermines the

16  claimant's complaints."  *Id.* at 972 (quotations omitted).  The ALJ may consider "ordinary

17  techniques of credibility evaluation," including the claimant's reputation for truthfulness and

18  inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained

19  or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."

20  *Smolen*, 80 F.3d at 1284.  The ALJ may not discredit the claimant's testimony as to the severity of

21  symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged

22  severity of" the symptoms.  *Bunnell v. Sullivan*, 947 F.2d 341, 343, 346-47 (9th Cir. 1991) (en banc)

23  (citations omitted).  Absent affirmative evidence that the claimant is malingering, the ALJ must

24  provide specific "clear and convincing" reasons for rejecting the claimant's testimony.  *Smolen*, 80

25  F.3d at 1283-84.

26         Plaintiff contends that the ALJ offered only two reasons for discrediting Plaintiff's

27  testimony: that her treatment notes indicated her physical therapy was successful, and that Dr. Seu

28  noted that Plaintiff had no trouble walking, standing, sitting, taking her shoes on and off, and getting

United States District Court

For the Northern District of California

1    on and off the examination table.  A.R. 25.  In response, Plaintiff argues that these reasons were

2    insufficient because Plaintiff's physical therapy only rehabilitated her left shoulder, not her other

3    disabling physical conditions, and because Dr. Seu's report is not dispositive of Plaintiff's physical

4    condition because Dr. Seu may have examined Plaintiff at a time when the limitations caused by her

5    chronic fibromyalgia were on the wane.

6         However, these reasons are neither the only rationales offered by the ALJ for discrediting

7    Plaintiff's testimony nor the only evidence in the record supporting his determination.  The ALJ

8    noted that the medical evidence of record did not support the degree of disability alleged by

9    Plaintiff.  A.R. 23-26 (discussing the findings of Drs. Gerber, Bilbrey, Seu, Tanenhaus, Khan, Iliya

10   and Arretz).  Both Drs. Bilbrey and Khan, the two psychiatric consultative examiners, reported that

11   Plaintiff could work.  A.R. 425, 508-509.  Drs. Gerber and Tanenhaus, the medical experts who

12   testified at the hearings, opined that Plaintiff could work with some limitations.  A.R. 84-85,

13   153-154.  Consultative examiner Dr. Seu opined that Plaintiff could stand, walk, sit and perform

14   postural activities without limitations in an eight-hour workday except she could only occasionally

15   reach overhead.  A.R. 414-416.  As discussed above, Plaintiff's treatment records from Drs. Iliya

16   and Arretz reflect limited conservative care.  These records are at odds with Plaintiff's descriptions

17   of her limitations.

18        Furthermore, as the ALJ also noted, Plaintiff's subjective pain complaints and her statements

19   concerning her daily activities were not consistent.  *See* A.R. 24 (noting that Plaintiff "is able to

20   work as a cosmetics sales person and complete a wide range of activities of daily living"); *Molina v.*

21   *Astrue*, 674 F.3d 1104 (9th Cir. 2012) (ALJ may discredit a claimant's testimony when the claimant

22   reports participation in everyday activities indicating capacities that are greater than the level of

23   disability alleged).  Plaintiff testified that she worked as an Avon sales representative during the

24   period in which she alleged disability.  She also reported in her application for disability benefits

25   and her statements to Dr. Seu and Dr. Bilbrey that she was able to engage in a full range of light

26   daily activities, including grocery shopping, doing housework, and visiting friends.  A.R. 340-347,

27   412-413, 424.

28

1    Because substantial evidence in the record supports the ALJ's credibility determination, the

2    ALJ did not err in finding that Plaintiff's subjective symptom reporting was not credible to the

3    extent it was inconsistent with the ALJ's RFC.

4                                **VIII.  Conclusion**

5    Based on the foregoing reasons, the court finds that the ALJ's decision that Plaintiff was not

6    disabled was supported by substantial evidence in the record and in accordance with law.

7    Accordingly, the court grants Defendant's motion for summary judgment and denies Plaintiff's

8    motion for summary judgment.

9    IT IS SO ORDERED.

10   Dated:  September 20, 2013

11                                _____

12                                DONNA M. RYU
                                 United States Magistrate Judge

**United States District Court**
For the Northern District of California